**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 27, 2023

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 27, 2023

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

IN THE MATTER OF THE
DETENTION OF
A.C.

_____

IN THE MATTER OF THE
DETENTION OF
N.G. and C.M.

_____

No. 100668-3
(consol. with No. 100690-0)

En Banc

Filed: July 27, 2023

GONZÁLEZ, C.J. –Washington State has the power, as currently codified in the involuntary treatment act (ITA), ch. 71.05 RCW, to involuntarily detain a person suffering from a behavioral health disorder for evaluation and treatment under certain limited circumstances. But involuntary detention, even when done for the person's own good, is a profound deprivation of liberty that the State may not impose without due process of law.

Due to the important liberty and safety issues implicated, the ITA and its statutory predecessors impose highly specific restrictions on the exercise of that power. To ensure that power is exercised under law and due process is satisfied, the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100668-3 (consol. w/ No. 100690-0)

ITA's requirements are strictly construed. The ITA allows for a brief, emergency detention on the authority of a designated crisis responder without prior judicial oversight. This brief emergency detention is designed for situations when a person is in crisis and effective alternatives to emergency detention do not exist. The person so held, however, must be promptly provided counsel and brought before a judge. If the State seeks to involuntarily detain a person for more than a brief period of time, it must establish its case by clear, cogent, and convincing evidence and may be required to do so before a jury. We are asked today when and whether an ITA petition should be dismissed when the State or its agents violate the ITA.

NG, CM, and AC were all involuntarily detained under the ITA. NG and CM were confined at Western State Hospital for more than a month after the court orders authorizing their continued civil commitments expired. Even after hospital staff realized the court orders had expired, they continued to hold NG and CM. Staff summoned designated crisis responders to initiate "new" ITA proceedings. AC was detained under a valid court order but was involuntarily medicated at an evaluation and treatment center before a court hearing despite asserting her statutory right to not be. The trial judge continued the hearing for a day to allow AC to appear un-medicated.

We hold that when the State totally disregards the requirements of the ITA by holding someone despite lacking the authority under the ITA to do so, the ITA petition shall be dismissed. Beginning "new" ITA proceedings while someone is

2

No. 100668-3 (consol. w/ No. 100690-0)

being held without authority of law is not an acceptable remedy. In NG's and CM's cases, we conclude the requirements of the ITA were totally disregarded and therefore reverse the Court of Appeals and remand to the trial courts for dismissal. In AC's case, we conclude that the requirements of the ITA were not totally disregarded and that she was not held without authority of law. In that case, we affirm the courts below.

BACKGROUND

This case involves three patients, NG, CM, and AC, who were involuntarily detained under the ITA and whose rights under the act were plainly violated. NG and CM had both been involuntarily detained at Western State Hospital on court orders authorizing the State to hold them for up to 180 days. AC was held on a court order directing she be involuntarily detained at Telecare North Sound Evaluation and Treatment Center for 14 days.

The court order authorizing NG's involuntary detention expired in December 2019. Western State Hospital continued to hold NG without an authorizing court order for more than a month after the order expired. A witness later testified that the order was allowed to expire, at least in part, because the State failed to properly

3

No. 100668-3 (consol. w/ No. 100690-0)

manage and maintain computer databases. The record does not reveal whether this problem has been remedied.

Problems at Western State Hospital persisted, and six months later, the court order authorizing the State to involuntarily detain CM expired. As with NG, Western State Hospital continued to hold CM without an authorizing court order for more than a month after the order expired. The record suggests that staff had timely prepared a petition for another 180 days of involuntary detention but had failed to file it with the court due to a problem with their email.

Once staff at Western State Hospital noticed that the orders authorizing NG's and CM's involuntarily detentions had expired, they started the ITA procedures over. NG and CM were examined by the designated crisis responders as if the initial emergency procedures of the ITA applied. Based on their evaluations, the responders placed NG and CM in emergency custody. The emergency custody provisions of the ITA do not provide for prior judicial review and are designed for the beginning of the ITA proceedings, not for after someone has already been involuntarily detained. RCW 71.05.153, .310. Shortly afterward, Western State Hospital filed new ITA petitions in court to detain NG and CM for 14 days.

At their first court hearings under the new petitions, NG and CM each moved to dismiss on the grounds that the ITA's requirements had been totally disregarded. In NG's case, the State successfully argued that the legislature would not have

4

No. 100668-3 (consol. w/ No. 100690-0)

intended dismissal as the appropriate remedy given how gravely disabled she was. In CM's case, the State unsuccessfully argued that the legislature intended money damages under RCW 71.05.510,[1] not dismissal, as a penalty for violation of the ITA.[2] A Pierce County commissioner granted CM's motion to dismiss.

While CM's and NG's cases were pending, AC was involuntarily detained under the ITA for 14 days at the Telecare North Sound Evaluation and Treatment Center. AC formally invoked her right not to be medicated 24 hours before her next court hearing. Despite her invocation of her right, AC was involuntarily medicated the day before the hearing. Once the court realized that AC had been involuntarily medicated, it continued the hearing for 24 hours, extended her detention, and directed that AC not be involuntarily medicated before the continued hearing. Sealed Clerk's Papers (CP) at 29.

---

[1] Under that provision, "Any individual who knowingly, willfully or through gross negligence violates the provisions of this chapter by detaining a person for more than the allowable number of days shall be liable to the person detained in civil damages." RCW 71.05.510. The ITA also provides, "Any person making or filing an application alleging that a person should be involuntarily detained, certified, committed, treated, or evaluated pursuant to this chapter shall not be rendered civilly or criminally liable where the making and filing of such application was in good faith." RCW 71.05.500. That section broadly exempts those involved in implementing the ITA from liability as long as they act "in good faith and without gross negligence." RCW 71.05.120(1), (2). Even though this has been a part of the ITA since it was enacted in 1973, we are unaware of any case where a successful action for damages has been brought under RCW 71.05.510. Laws of 1973, 1st Ex. Sess., ch. 142, § 56.

[2] The State also argued that the motion to dismiss was filed under the wrong cause number. The motion had been filed under the cause number associated with the expired court order, not the new cause number associated with the State's new petition. This argument did not prevail.

5

No. 100668-3 (consol. w/ No. 100690-0)

At that continued hearing, AC moved to dismiss the ITA petition on the grounds the treatment center violated the ITA. The court denied the motion, concluding that the State's failure to comply with the statute was outweighed by the State's interest in reaching the merits. AC appealed denial of her motion to dismiss. Based on the merits of the petition, the intent of the statute, and its determination of whether the State totally disregarded the statutory requirements, Division One of the Court of Appeals affirmed. *In re Det. of A.C.*, No. 82653-1-I, slip op. at 1 (Wash. Ct. App. Jan. 18, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/826531.pdf.

NG appealed both the denial of her motion to dismiss and the order granting the State's ITA petition. The State appealed the Pierce County commissioner's grant of CM's motion to dismiss. NG's and CM's cases were consolidated on appeal and heard by Division Two. *In re Det. of N.G.*, 20 Wn. App. 2d 819, 822, 503 P.3d 1 (2022). The State argued that dismissal of the "new" ITA petitions was not an appropriate remedy for allowing a previous involuntary commitment order to expire. Division Two held "that dismissal of a new 14-day petition for involuntary treatment under a new cause number is an available remedy when a committed person is detained improperly beyond the end date of an involuntary commitment order, but only if the petitioner has totally disregarded ITA requirements." *Id.* Division Two proposed a totality of the circumstances test that required the court to balance the

6

No. 100668-3 (consol. w/ No. 100690-0)

violation of the ITA against the merits of the petition, among other things, and remanded to the trial courts to apply this new approach. *Id.*

AC, NG, and CM all sought review, which we granted. The cases for AC, NG, and CM were consolidated, and a related case, *In re Detention of D.H.*, No. 100716-7, was set as a companion. The American Civil Liberties Union of Washington, Disability Rights Washington, the King County Department of Public Defense and Washington Defender Association filed an amici brief in support of AC, NG and CM.

ANALYSIS

First, we must decide when and whether dismissal is required when the ITA has been violated. This is a question of law we review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). Next, we must decide whether the trial courts properly applied the law in these cases. Application of the law to a particular set of disputed facts is reviewed for an abuse of discretion. *State v. Sisouvanh*, 175 Wn.2d 607, 620, 290 P.3d 942 (2012) (citing *State v. Lord*, 117 Wn.2d 829, 901, 822 P.2d 177 (1991)). Discretion is abused if, among other things, it is exercised on untenable grounds, such as a misunderstanding of the law. *See id.* at 623 (citing *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

While the parties frame their arguments around the statutory requirements of the ITA, we are mindful that those statutory requirements are rooted in our common

7

No. 100668-3 (consol. w/ No. 100690-0)

law and constitutions. "Involuntary commitment for mental disorders constitutes a significant deprivation of liberty that requires due process protections." *In re Det. of C.W.*, 147 Wn.2d 259, 277, 53 P.3d 979 (2002) (citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)). "The State's lawful power to hold those not charged or convicted of a crime is strictly limited." *In re Det. of D.W.*, 181 Wn.2d 201, 207, 332 P.3d 423 (2014) (citing *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992)). The State may not take a person's liberty without according them due process of law. WASH. CONST. art. I, § 3.

Due process also requires regular judicial review to ensure the restrictions on liberty do not persist longer than necessary given the State's legitimate purposes. *See State v. McCuistion*, 174 Wn.2d 369, 385, 275 P.3d 1092 (2012) (citing *Jones v. United States*, 463 U.S. 354, 368, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983)). Involuntary detention under a civil commitment statute like the ITA is "constitutional only when both initial and continued confinement are predicated on the individual's mental abnormality and dangerousness," among other constitutional requirements. *Id.* at 387 (citing *Foucha v. Louisiana*, 504 U.S. 71, 77-78, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)).

What process is due is shaped in part by the processes established by the legislature. Nearly a century ago, this court reversed a civil commitment order under an earlier version of the ITA, reasoning, "'Where a statute prescribes a certain method

8

No. 100668-3 (consol. w/ No. 100690-0)

of procedure to determine whether persons are insane, such inquiries must be conducted in the mode prescribed, and the statute regulating such proceedings must be followed strictly.'" *In re Welfare of Eastman*, 151 Wash. 321, 322, 275 P. 724 (1929) (quoting 14 RULING CASE LAW *Insanity*, § 8, at 556-57 (1916)). As we put it more recently, "[t]he ITA impacts liberty interests and thus is strictly construed." *D.W.*, 181 Wn.2d at 207 (citing *In re Det. of G.V.*, 124 Wn.2d 288, 296, 877 P.2d 680 (1994)).

This strict construction comes with consequences. In a case involving a person involuntarily detained at Harborview Medical Center, we observed that "[i]f Harborview had totally disregarded the requirements of the statute or had failed to establish legal grounds for Swanson's commitment, certainly dismissal would have been proper. *Indeed, it would have been required*." *In re Det. of Swanson*, 115 Wn.2d 21, 31, 804 P.2d 1 (1990) (emphasis added).

But not every violation of the ITA necessitates dismissal. "The [legislative] goals of ensuring continuity of care and protecting the public are decidedly not met if dismissal of properly filed and factually supported petitions turns on [things other] than on the court's determination of whether or not legal grounds for commitment exist." *Id.* at 29. Accordingly, "[u]nderlying the involuntary treatment act is a tacit presumption in favor of deciding issues on the merits." *G.V.*, 124 Wn.2d at 296.

These tensions are reflected in the legislature's statement of intent:

9

No. 100668-3 (consol. w/ No. 100690-0)

(a) To protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state;

(b) To prevent inappropriate, indefinite commitment of persons living with behavioral health disorders and to eliminate legal disabilities that arise from such commitment;

(c) To provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders;

(d) To safeguard individual rights;

(e) To provide continuity of care for persons with serious behavioral health disorders;

(f) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; and

(g) To encourage, whenever appropriate, that services be provided within the community.

RCW 71.05.010(1). Prompted by our opinion in *D.W.,* the legislature added subsection (a), which asserts the State's parens patriae and police power over those afflicted by serious behavior health conditions, and a new provision:

> When construing the requirements of this chapter the court must focus on the merits of the petition, except where requirements have been totally disregarded, as provided in *In re C.W.*, 147 Wn.2d 259, 281 (2002). A presumption in favor of deciding petitions on their merits furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment.

RCW 71.05.010(2); S.B. Rep. on Engrossed Second Substitute S.B. 5649, at 2, 64th Leg., Reg. Sess. (Wash. 2015) (citing *D.W.*, 181 Wn.2d 201).

10

No. 100668-3 (consol. w/ No. 100690-0)

In *D.W.*, the State had appealed a commissioner's determination that using single bed certifications to hold patients in institutions that did not provide evaluation and treatment (sometimes called psychiatric boarding) was unconstitutional and unlawful. 181 Wn.2d at 211. The commissioner had clearly been disturbed by the number of people who had been brought before him from single bed certifications in institutions that were not providing appropriate treatment. *Id.* at 205. In the court papers, he strongly suggested civil damages or injunctive relief would be appropriate to remedy the State's failure to provide appropriate evaluation and treatment for those it involuntarily detained. We affirmed the commissioner and held that patients involuntarily detained under the ITA had to be placed in a treatment facility unless they needed treatment, such as dialysis, that was not available in a certified setting. *Id*. at 211. Since then, the Department of Social and Health Services (DSHS) expanded the number of certified beds and promulgated a rule that allows ITA detentions in noncertified institutions that have the capacity to treat those detained. S.B. REP. ON ENGROSSED SECOND SUBSTITUTE S.B. 5649, at 2; WAC 182-300-0100.[3]

---

[3] Despite our opinion and the legislature's actions, a recent government report suggests that there are about 850 single bed certifications a month, and about 80 cases where no bed can be found, in Washington State. WASH. STATE HEALTH CARE AUTH., SINGLE BED CERTIFICATION AND UNAVAILABLE DETENTION FACILITY REPORT (NO BED REPORT) QUARTERLY UPDATE (2022), https://www.hca.wa.gov/assets/program/single-bed-certification-quarter-1.pdf [https:perma.cc/GQF8-L8DG]. It also appears that people of color are significantly overrepresented among those involuntarily detained under the ITA. LAINA POON ET AL., KING

11

No. 100668-3 (consol. w/ No. 100690-0)

The post-*D.W.* amendment to the legislature's statement of intent highlights the tension between the constitutional requirement that liberty not be taken without due process of law, the rights of those involuntarily detained under the ITA to appropriate treatment, and the fact that our involuntary mental health system has been consistently overwhelmed and legal requirements regularly disregarded. *See* WASH. CONST. art. I, § 3; RCW 71.05.010(2); *D.W.*, 181 Wn.2d at 204 (citing Mary L. Durham & John Q. La Fond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 YALE L. & POL'Y REV. 395, 411-12 (1985)); *see also Trueblood ex rel. Badayos v. Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1044 (9th Cir. 2016) (noting that in the related context of competency restoration for those charged with a crime, the State "has 'demonstrated a consistent pattern of intentionally disregarding court orders . . . and [has] established a de facto policy of ignoring court orders which conflict with [its] internal policies'" (alterations in original) (quoting *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010, 1024 (W.D. Wash. 2015))). It is also at odds with the original purpose and deep structure of the ITA: "to provide specific procedural protections for mentally ill persons subject to involuntary mental [health] treatment" through a process that includes stages of

COUNTY AUDITOR'S OFF., INVOLUNTARY TREATMENT ACT COURT: REENTRY AND COURT OUTCOMES 7 (2019), https://kingcounty.gov/~/media/depts/auditor/new-web-docs/2019/ita-court-2019/ita-2019.ashx?la=en [https://perma.cc/MD4A-YFUJ].

No. 100668-3 (consol. w/ No. 100690-0)

detentions that increase in length. *In re Det. of A.S.*, 138 Wn.2d 898, 909, 982 P.2d 1156 (1999) (citing RCW 71.05.030); *In re Det. of Dydasco*, 135 Wn.2d 943, 947, 959 P.2d 1111 (1998).

With these considerations in mind, we turn to the specific cases before us.

## I. NG & CM

Under both RCW 71.05.010 and long-standing precedent of this court rooted in due process, the State may not totally disregard the requirements of the ITA when involuntarily detaining a person. *Swanson*, 115 Wn.2d at 31. When it does totally disregard those requirements, dismissal is required. *Id.*; *see also C.W.*, 147 Wn.2d at 283 ("Furthermore, allowing dismissal in cases where the professional staff totally disregarded the statutory requirements serves as a general safeguard against abuse."); *In re Det. of K.R.*, 195 Wn. App. 843, 847, 381 P.3d 158 (2016) (dismissing ITA petition because the designated mental health provider failed to consult with the examining emergency room physician as required under former RCW 71.05.154 (2013)). In such circumstances, no weighing of the merits of the ITA petition is appropriate.

We recognize that in some cases, it will be difficult to determine whether the requirements of the ITA have been totally disregarded. Neither "totally" nor "disregarded" is defined in the ITA. *See* RCW 71.05.020 (definitions). "Totally"

13

No. 100668-3 (consol. w/ No. 100690-0)

is defined in *Merriam-Webster* as "in a total manner **:** to a total or complete degree." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/totally (last visited June 16, 2023). "Disregard" is defined as "to pay no attention to **:** treat as unworthy of regard or notice" and as "the act of treating someone or something as unworthy of regard or notice **:** the state of being disregarded." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/disregard (last visited June 16, 2023). In the admittedly very different context of negligent homicide, we observed that:

> disregard . . . implies an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term "negligence." Every violation of a positive statute, from a defective taillight to an inaudible horn may constitute negligence under the motor vehicle statutes, yet be unintentional, committed without knowledge, and amount to no more than oversight or inadvertence but would probably not sustain a conviction of negligent homicide. To drive with disregard for the safety of others, consequently, is a greater and more marked dereliction than ordinary negligence. It does not include the many minor inadvertences and oversights which might well be deemed ordinary negligence under the statutes.

*State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). Taken together, we conclude that the requirements of the ITA have been totally disregarded when a person is involuntarily detained without legal authority under the act.[4] The

---

[4] We respectfully disagree with the dissent that the critical question is whether a mandatory provision of the act has been violated. *See* dissent at 7-8 (listing some mandatory provisions of the ITA). Certainly, the violation of some mandatory provisions of the ITA would require dismissal by the plain terms of the act. *E.g.*, RCW 71.05.040 ("Persons with developmental

14

No. 100668-3 (consol. w/ No. 100690-0)

requirements of the ITA are not totally disregarded in every case where some

aspect of the act has been violated.

But the orders giving the State legal authority to involuntarily detain NG and

CM had expired. Continuing to involuntarily detain them after the orders expired

was without authority of law. The ITA itself mandates release in such

circumstances. Most relevantly, the ITA provides:

> (4) The person shall be released from involuntary treatment at the expiration of the period of commitment imposed under subsection (1)[5] or (2)[6] of this section unless the superintendent or professional person in charge of the facility in which he or she is confined, or in the event of a less restrictive alternative, the designated crisis responder, *files a new petition for involuntary treatment*.
> . . . .
> (8) *No person committed under this section may be detained unless a valid order of commitment is in effect.* No order of commitment under this section may exceed 180 days in length except as provided in subsection (7) of this section.[7]

RCW 71.05.320 (emphasis added). Plainly, the ITA requires patients shall be

released once the court order authorizing their detention expires unless a judge

---

disabilities, impaired by substance use disorder, or suffering from dementia shall not be detained for evaluation and treatment or judicially committed solely by reason of that condition.") The critical question is whether a person is being held without authority of law—in CM's and NG's cases, because the court orders authorizing their detentions had expired.

We stress, however, that we do not mean to describe the entire universe of cases where a violation of the ITA might amount to a total disregard of the requirements of the act. We address only the factual circumstances before us here.

[5] Providing for full custody of DSHS or an approved program for no more than 180 days. RCW 71.05.320(1).

[6] Providing for a less restrictive alternative. RCW 71.05.320(2).

[7] Providing for up to a year of less restrictive treatment upon release from intensive impatient treatment at a state hospital. RCW 71.05.320(7).

15

No. 100668-3 (consol. w/ No. 100690-0)

enters a new civil commitment order that extends their involuntary detention. RCW 71.05.320(4). NG and CM should have been released before any new proceeding was initiated.[8] Initiating new proceedings while the person is still involuntarily detained under an expired court order is not permitted by the ITA and is not a remedy for this total disregard of the ITA's requirements. It ignores the State's escalating burdens. The person must be released from custody into the community before a new evaluation is appropriate.

The State totally disregarded the ITA when it held NG and CM for more than a month after the civil commitment orders authorizing their involuntary detentions expired. Under these circumstances, filing a "new" petition for custody was merely an attempt to extend the existing custody that had long previously expired. Under both *Swanson* and RCW 71.05.010(2), their dismissal motions should have been granted.

---

[8] A court order committing someone under the ITA for involuntary treatment is not like a one year lease that expires but allows tenants to stay at the sufferance of the property owner. *Compare Marsh-McLennan Bldg., Inc. v. Clapp*, 96 Wn. App. 636, 644, 980 P.2d 311 (1999), *with* ch. 71.05 RCW. Once the ITA commitment order expires, the authority of law expires. Once a lease expires, the property owner may suffer the tenant, with whom they had a voluntary contractual relationship, to remain. There was nothing voluntary about NG's and CM's commitments under the involuntary treatment act.

No. 100668-3 (consol. w/ No. 100690-0)

## II. AC

AC's rights under the ITA were plainly violated. Staff at the evaluation and treatment center violated her right to decline medication before a court hearing. This should not have happened.

AC contends that an ITA petition should be dismissed if the ITA, strictly construed, was not followed. But this approach would be at odds with both the ITA and our case law. The legislature has directed courts to focus on the merits of the petition unless the requirements of the ITA have been totally disregarded. RCW 71.05.010(2). This standard, ultimately, is rooted in our opinion in *Swanson*. *See Swanson*, 115 Wn.2d at 31. Codification does not lessen *Swanson*'s precedential value.

AC also argued that her due process and statutory rights were totally disregarded when she was forcibly medicated. But unlike NG and CM, AC was never held without authority of law. AC was brought before a judge on the appointed day. The court acted promptly to remedy, as much as possible, the violation of the ITA. In such a case, a court considering a motion to dismiss must consider the totality of the circumstances in determining whether the requirements of the act have been totally disregarded. In this case, given the relatively brief time AC was held, the fact she was brought before a judge on the appointed day, the

17

No. 100668-3 (consol. w/ No. 100690-0)

fact the judge extended her detention, and her clear need for additional treatment, we hold that the trial court did not abuse its discretion in denying the motion to dismiss.[9]

CONCLUSION

Power must be exercised under law. Under the ITA, the State has the power, without prior judicial review, to briefly detain a patient for evaluation and treatment in emergency circumstances. RCW 71.05.150, .153. Once involuntarily detained, the patient must be afforded a lawyer and promptly brought before a judge to determine whether, based on a preponderance of the evidence, an additional 14 days of evaluation and treatment is required. RCW 71.05.240(4)(a). Once a patient has been involuntarily detained for 14 days, a court may authorize, after a hearing, and based on clear, cogent, and convincing evidence, an additional 90 or 180 days of civil commitment. RCW 71.05.310.

The State totally disregarded these requirements in NG's and CM's cases when they were each held for more than a month after the court orders authorizing their civil commitments expired. When the requirements of the ITA have been totally disregarded, the ITA petition must be dismissed. *See Swanson*, 115 Wn.2d at 31. Accordingly, we reverse the Court of Appeals in *N.G.* and *C.M.,* reverse

---

[9] We stress that on the record before us, AC was never held without authority of law. She was at all times detained either under the emergency provisions of the ITA or by court order.

No. 100668-3 (consol. w/ No. 100690-0)

Commissioner Kiesel's denial of NG's motion to dismiss, and affirm Commissioner

Adams' grant of CM's motion to dismiss.

We affirm the Court of Appeals on different grounds in AC's case. Though

the ITA was violated when she was involuntarily medicated, she was not detained

without authority of law.

We remand these cases to the trial courts for any further proceedings

necessary consistent with this opinion.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100668-3 (consol. w/ No. 100690-0)

_González, C.J._

WE CONCUR:

_____          _Gordon McCloud, J._

_____          _Yu, J._

_____          _Montoya-Lewis, J._

_____          _Whitener, J._

20

*In re Det. of A.C., N.G., & C.M.*

No. 100668-3
(consol. w/100690-0)

MADSEN, J. (concurring/dissenting)—This case turns on the meaning of statutory terms, legislative intent, and public policy. The involuntary treatment act (ITA), ch. 71.05 RCW, states that the requirements of the chapter must be construed such that petitions are decided on the merits, "except where requirements have been *totally disregarded*." RCW 71.05.010(2) (emphasis added). The legislature adopted the phrase "totally disregarded" from a decision of this court, *In re Detention of C.W.*, which provides that dismissal is not an appropriate remedy for every violation but "may be appropriate *in the few cases* where [providers] 'totally disregarded the requirements of the statute.'" 147 Wn.2d 259, 283, 53 P.3d 979 (2002) (emphasis added) (quoting *In re Det. of Swanson*, 115 Wn.2d 21, 31, 804 P.2d 1 (1990)).

Here, the majority concludes that a total disregard occurs when a person is involuntarily detained without legal authority under the ITA, requiring dismissal of the petitions for commitment. Majority at 13-14; RCW 71.05.320(8).

I disagree. Instead, the term "totally disregarded" must be read together with the legislative intent of the ITA, the presumption in favor of deciding cases on the merits,

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

and the public policy of providing mental health services to gravely disabled persons and protecting the public. *See C.W.*, 147 Wn.2d at 283. We should hold that the requirements of the ITA are totally disregarded only when the action or inaction complained of thwarts the fundamental purposes of the act. For the violations here, dismissal is not warranted and, instead, the remedy is refiling a petition, as was done in this case. I respectfully dissent.[1]

DISCUSSION

Rules of Statutory Construction

The meaning of a statute is a question of law reviewed de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). A court's fundamental objective is to ascertain and carry out the legislature's intent. *Id*. If the statute's meaning is plain, then we give effect to that plain meaning as an expression of legislative intent. *Id.* at 9-10. Plain meaning is derived from what the legislature has said in the statute, related statutes, and context of the statutory scheme as a whole. *Id*. at 11; *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Absent a specific statutory definition, words in a statute are given their ordinary meaning and we may discern that meaning from the dictionary. *State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997); *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). Washington's civil commitment statutes involve a deprivation of liberty, and therefore they should be strictly construed. *C.W.*, 147 Wn.2d at 272. But courts must also "'keep

---

[1] As discussed below, I concur with the majority in affirming A.C.'s case.

2

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

in mind the need to satisfy the intent of the statute while avoiding absurd results.'" *Id.* (quoting *Swanson*, 115 Wn.2d at 28).

Meaning of "Totally Disregarded"

Subsection (2) of RCW 71.05.010 provides the language at issue: "[w]hen construing the requirements of this chapter the court must focus on the merits of the petition, except where requirements have been *totally disregarded*, as provided in *In re C.W.*" (Emphasis added.) The ITA does not define "totally disregarded," thus we turn to the dictionary.

*Webster's* defines the verb to "disregard" as "to treat without fitting respect or attention," "to treat as unworthy of regard or notice," and "to give no thought to : pay no attention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 655 (2002). The word "totally" is defined as "in a total manner : COMPLETELY, WHOLLY," and the word "total" is defined as "unqualified in extent or degree : ABSOLUTE, UTTER." *Id.* at 2414-15. Together, the terms "totally disregarded" mean to treat something as utterly or wholly unworthy of regard or notice. Under chapter 71.05 RCW, the ITA is totally disregarded when it is treated as wholly unworthy of respect or notice.

When considering the remedy for violations of the ITA, the act and *C.W.*, which the legislature relied on, say that the court should "focus on the merits of the petition, the intent of the statute, *and* whether the State 'totally disregarded the requirements of the statute.'" *C.W.*, 147 Wn.2d at 281 (emphasis added) (quoting *Swanson*, 115 Wn.2d at 31).

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

Understanding *C.W.* is critical to interpreting "totally disregarded" because the legislature adopted that term from *C.W.* The case teaches that dismissal may be appropriate in a "few cases," *id.* at 283, but it should be used rarely and only after considering legislative intent and the presumption that petitions be decided on their merits. *Id.* at 281. That presumption furthers public and private interests because releasing an individual who is in need of treatment implicates the well-being of those individuals as well as public safety. RCW 71.05.010(2). These dual purposes are reflected in the legislative intent of the ITA: to protect the health and safety of persons suffering from behavioral health disorders and protecting public safety; preventing inappropriate and indefinite commitments; providing prompt evaluation and timely and appropriate treatment; safeguarding individual rights; providing continuity of care; and encouraging full use of existing agencies, personnel, and public funds to prevent duplication of services. RCW 71.05.010(1)(a)-(f).

Relevant here, this court has declined to dismiss commitment petitions for timeliness violations in controlling ITA cases. In *C.W.*, we held that hospitals had violated the ITA's six-hour time limit to refer patients for evaluations by designated mental health professionals but concluded that dismissal of their commitment petitions was not the appropriate remedy. 147 Wn.2d at 282. *Swanson* concerned the timing of a probable cause hearing for a 14-day involuntary treatment petition. 115 Wn.2d at 23. In that case, Swanson's attorney moved unsuccessfully to dismiss the petition because the initial 72-hour hold had expired prior to the court's ruling. *Id.* at 23-24. On appeal, this

4

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

court held that for civil commitment purposes, a hearing begins when the court calendar begins and parties' attorneys are ready to proceed rather than when a hearing on a specific petition begins. *Id.* at 31. Thus, *Swanson* concluded dismissal of the 14-day petition was unwarranted because the State had not totally disregarded the ITA. *Id.* at 28.

Both *C.W.* and *Swanson* involved the failure to adhere to a time limit set out in the ITA; and in both cases, this court held that dismissal was inappropriate when weighed against the presumption of deciding cases on their merits and considering the intent of the act. *See C.W.*, 147 Wn.2d at 283. The court in both cases also recognized that the detentions violated the ITA, but in neither case did this court consider the mental state underlying the violation and in neither case did the court dismiss the petition.

Guided by *C.W.*, the remedy of dismissal is available only in those few cases where the action or inaction complained of disregards the fundamental purposes and intent of the ITA. *Id*. at 281. This standard considers the presumption in favor of deciding petitions on the merits, the goals of the ITA, and whether the requirements of the ITA have been treated as wholly unworthy of respect or notice.[2]

---

[2] In examining whether the action or inaction complained of disregards the fundamental purposes and intent of the ITA, it may be appropriate to consider some of the factors outlined by the Court of Appeals. These factors may include the extent to which the petitioner's conduct and the committed person's requested remedy safeguard the committed person's health and safety, ensure appropriate treatment, and are protective of public safety. Other considerations may be whether the petitioner has a process in place to comply with statutory requirements; the extent to which the petitioner attempted to comply with that process; and the actions of the petitioner upon discovering a statutory violation—which concern the safeguarding of individual rights. *See* Suppl. Br. of Resp't N. Sound Telecare E&T Ctr. at 16; RCW 71.05.010(1)(d). Relevant considerations should reflect the legislative intent of the ITA as set out in RCW 71.05.010(1).

5

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

In contrast with *C.W.* and *Swanson*, the majority concludes that the ITA has been "totally disregarded" when a person is detained without legal authority under the act. Majority at 14. Though it recites the dictionary definitions of the terms, the majority takes a left turn analogizing "disregard" to the "very different context of negligent homicide." *Id.* In doing so, the majority seems to conclude that "total disregard" means more than "'minor oversights and inadvertences,'" and is instead a "'more marked dereliction than ordinary negligence.'" *Id.* (quoting *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967)).

This is a puzzling, inapt, and unnecessary analogy. It implies that criminal negligence has a place in a court's review of the civil commitment statutes. The majority "[t]ake[s]" the dictionary definitions and, presumably, the negligent homicide analogy "together" to hold that the ITA is totally disregarded when a person is involuntarily detained without legal authority under the act. *Id.* But the majority does not return to the criminal negligence analogy nor does it apply its apparent mental element to the facts of this case, providing no guidance as to how that element fits into the analysis. The negligent homicide discussion is a confusing detour.

In addition, the majority's analogy to the criminal law fails to consider the purposes of the ITA and the legislative intent that dismissal is an extraordinary remedy to be seldom used. The court should not analogize to a different area of the law and potentially further complicate matters, especially when the dictionary definitions provide all the meaning necessary and more closely align with the legislature's intent that

6

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

petitions be decided on the merits for the benefit of the detained person, their families,

and the public at large.

The majority also reasons that the ITA itself requires dismissal: "No person

committed under this section may be detained unless a valid order of commitment is in

effect." Majority at 15 (emphasis omitted) (quoting RCW 71.05.320(8)). But this misses

the point.

There is no dispute that the civil commitment orders for the detained persons in

this case expired and they were held over in violation of the ITA.[3] The question before

us is whether that violation is a "total disregard" of the ITA and, if so, whether dismissal

is the appropriate remedy. Where a person is still in need of treatment, is receiving

treatment, and is eligible for a new commitment period, the failure to timely refile for a

new commitment period is not a "total disregard" of the purposes of the ITA.

The majority's test for total disregard is also unhelpful because it is circular. The

involuntary commitment process is highly regulated, and the ITA is replete with

mandatory language. *E.g.*, RCW 71.05.040 ("Persons with developmental disabilities,

impaired by substance use disorder, or suffering from dementia *shall not* be detained for

evaluation and treatment or judicially committed solely by reason of that condition."

(emphasis added)), .110 ("Attorneys appointed for persons pursuant to this chapter *shall*

---

[3] The majority adds that a judicial order involuntarily detaining a person under the ITA "is not like a one year lease that expires but allows tenants to stay" over the time period of the lease. Majority at 16 n.8. I agree. But I am, and no doubt readers of both opinions are, left puzzled as to why the majority even raises this analogy considering neither the dissent nor any party mentions residential leases and to do so risks making its opinion more confusing.

7

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

*be* compensated for their services." (emphasis added)), .153(4) ("Within three hours after arrival [at a designated treatment facility], not counting time periods prior to medical clearance, the person *must be* examined by a mental health professional." (emphasis added)), .210(1)(a)(i), (ii) ("Each person involuntarily detained and accepted or admitted at an evaluation and treatment facility . . . : . . . *Shall*, within twenty-four hours of [their] admission or acceptance at the facility, not counting time periods prior to medical clearance, be examined and evaluated by: . . . One physician, physician assistant, or advanced registered nurse practitioner; and . . . One mental health professional." (emphasis added)). Thus, any time a provider fails to follow *any* mandatory provision of the ITA (such as those listed above) they lack authority of law. Under the majority's holding, any misstep would result in dismissal. In other words, there will never be an exception, only the rule. The ITA, however, plainly contemplates that dismissals will be rare.

The majority's test is also overly broad. Here, the mental health providers for N.G., C.M., and A.C. filed new commitment petitions when the original orders expired. The parties agree that new petitions could be filed.[4] The majority applies its rule not just to the previously expired petitions but to the *new* petitions as well. This remedy of dismissal attaches not only to actions taken without "authority of law"—it "remedies" actions that are wholly compliant with the ITA.

---

[4] N.G., C.M., and A.C. disagree as to *when* those petitions could be filed and whether release was required prior to filing.

8

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

Applying the Majority's "Totally Disregarded" Standard to a Subsequent, Properly Filed Petition

The State argues, and the parties appear to agree, that new petitions for evaluation and treatment are not precluded by prior ITA violations. Joint Suppl. Br. of the Att'y Gen's Off. & Pierce County Prosecuting Att'y's Off. at 28-29 (noting N.G. and C.M. do not argue that they are not redetainable in the future); Reply Br. of Appellant (Wash. Ct. App. No. 82653-1-I (2021)) at 7 ("If A.C. continued to meet the criteria for commitment, the State could simply file a new petition."). The ITA permits the use of a person's recent history to determine whether that person should be civilly committed, that is, whether they are gravely disabled, present a likelihood of serious harm, or are in need of treatment. RCW 71.05.245(1). This history can include violent acts and, relevant here, "recent history of one or more commitments" under the ITA or equivalent provisions in another state. RCW 71.05.245(3)(a)-(b). Consideration of past commitments, irrespective of whether those commitments included ITA violations, aligns with the ITA's intent. It furthers the goals of protecting persons with behavioral health disorders based on their current behavior and recent history, which also assists in preventing inappropriate commitments. RCW 71.05.010(1)(a)-(b).

As the parties acknowledge, the detained persons could be released for a minute or two and then properly detained for new commitment proceedings. *See* Sealed Rep. of Proc. (RP) (Aug. 5, 2020) at 3, 18 (noting C.M. could be released for minutes in the community before almost immediate redetention). Inexplicably, the majority says these new proceedings cannot commence without a physical release. But this makes little

9

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

sense since these new proceedings can properly include the individuals' most recent

commitment history under RCW 71.05.245.  While the majority's holding would allow

the detained persons to have their liberty, it is a fleeting liberty.  Apparently, the majority

would have mental health providers wait at the door for these individuals, who are clearly

in need of continued treatment, to be released and then refile for continued detention.

Undoubtedly, the ITA involves substantial curtailments of due process rights, but

nowhere does the act contemplate release for mere moments as a meaningful remedy for

total disregard of statutory requirements.  The majority's solution is an empty remedy.

Instead, the remedy of commencing a new petition while an individual is detained

is sensible and does not undermine the ITA's goal of preventing indefinite commitments.

The commencement of new petitions involves numerous safeguards.  Designated crisis

responders file petitions only after they determine the person meets the criteria for civil

commitment.  RCW 71.05.150, .153.  Holding a person past the expiration of their

original commitment orders does not create indefinite commitments.  That individual is

entitled to multiple reviews of their current mental and behavioral status, from the

designated crisis responder to a judicial officer.  At each point in this process, the

detained individual must be found to meet criteria for continued commitment or be

released.  *E.g.*, RCW 71.05.260 (mandating release if a professional determines the

person no longer meets criteria for detention).  The individual's need for treatment drives

the process, which requires additional protections as the potential commitment period

becomes longer.  *In re Det. of E.S.*, 22 Wn. App. 2d 161, 179, 509 P.3d 871 (2022)

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(quoting *In re Det. of Dydasco*, 135 Wn.2d 943, 947, 959 P.2d 1111 (1998) ("The act is

intended to be applied 'in stages,' with increasing terms of involuntary treatment and

detention to be accompanied by increasing procedural protections.").

In civil commitment cases, courts must balance the interests of the detained person

with the interests of the State, as detailed in the ITA. *See C.W.*, 147 Wn.2d at 281. When

persons are in obvious need of behavioral health services and pose serious risks of harm

to themselves or others, like the individuals in this case, the ITA's purpose counsels

continued detention for treatment rather than release. Release without regard for the

individual's needs and safety or that of the public upends the foundational purposes of the

ITA.

Application to N.G., C.M., and A.C.

Turning to the facts of this case, I would hold that the continued detention of N.G.,

C.M., and A.C. did not totally disregard the ITA. N.G.'s 180-day commitment expired

on December 24, 2019, but due to a computer error at Western State Hospital and a

mental health provider who moved positions, N.G.'s additional commitment petition was

not filed. About a month later, hospital staff discovered that the original order had

expired and because N.G.'s provider was concerned that release would place N.G. at

"serious risk of mortality," summoned a designated crisis responder to conduct an

immediate investigation. Sealed Clerk's Papers (CP) at 1-3; RP (Jan. 29, 2020) at 17.

The responder took N.G. into emergency custody, and the superior court subsequently

granted the hospital's petition for 14 days of involuntary treatment over N.G.'s motion to

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

dismiss. Western State staff testified that N.G. was dependent on them for health and safety; the staff ensured N.G. would eat and provided continuous observation to prevent N.G. from assaulting other patients and/or staff. Hospital staff further testified that N.G. was aggressive on a continuous basis and that N.G. would frequently answer questions with incoherent statements. If released, N.G. had no way to obtain shelter, had no financial resources, was physically frail, and would not know to seek out resources or assistance. One of N.G.'s providers testified that outside the hospital setting (without security and staffing), N.G. would be at risk of self-harm and of harming others.

The holding over of N.G. was not a total disregard of the ITA when considering the intent and purpose of the act. N.G.'s mental health provider was concerned that N.G. would be at risk of *mortality* if released. Western State Hospital staff testified that N.G. depended on them completely to meet N.G.'s health and safety needs, in addition to protecting others from N.G.'s assaultive behavior. N.G. was physically frail, often communicated incoherently, and lacked the cognitive ability to independently seek out essential resources. Continuing detention protected N.G.'s health and safety, as well as the general public. RCW 71.05.010(1)(a). Immediately commencing new commitment procedures when the expired order was discovered prevented inappropriate and indefinite commitment, and provided prompt evaluation and appropriate treatment by recalling a designated crisis responder for a new evaluation and subsequent judicial oversight. RCW 71.05.010(1)(b)-(c). It also ensured the continuity of care for N.G.—continuing to work with providers familiar with N.G. and their needs. *See* RCW 71.05.010(1)(e). Staff

12

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

testimony made clear that N.G. could not, at that point, receive services outside the hospital. *See* RCW 71.05.010(1)(f).

Moreover, Western State Hospital's actions did not demonstrate a total disregard for the ITA. The movement of staff to a new position and problems with the hospital database led to the lapse of N.G.'s original commitment order. These were oversights to be sure. But they do not evince an utter and complete lack of respect or regard for ITA requirements. Even by the majority's reasoning, Western State's staffing and computer problems amount to inadvertences rather than a "'more serious dereliction.'" *See* majority at 14 (quoting *Eike*, 72 Wn.2d at 765).

C.M. was diagnosed with schizoaffective bipolar disorder and had been detained at Western State Hospital since 2016. C.M.'s 180-day commitment expired on June 23, 2020. C.M.'s providers had prepared a petition for additional commitment, but for reasons unknown, the court hearing scheduler's e-mails to the parties did not reach them, and the scheduler was not aware of the error. Western State later investigated the cause of that error and has undertaken steps to fix it. Nevertheless, C.M.'s commitment expired, and no new order was issued for continuing treatment. Four days later, Western State discovered the error and initiated new proceedings by calling for a crisis responder, who evaluated and placed C.M. in emergency detention. As with N.G., C.M.'s providers petitioned for additional treatment, and C.M. moved to dismiss the new petition, which the court granted.

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

I would also conclude that C.M.'s continued detention was not a total disregard of the ITA. The record shows that C.M. has schizoaffective bipolar disorder, required two-to-one staff monitoring, and was described as one of the most assaultive patients at Western State Hospital. During C.M.'s commitment, C.M. was continuously assaultive, except for a six-month period from 2019 to 2020. The assaults were apparently "indiscriminate" and occurred with and without provocation. CP at 91. When C.M. was transferred to a different ward, specifically created to work with the most assaultive patients at the hospital, C.M.'s behavior resulted in the use of restraints to ensure the safety of C.M. and others.

Releasing C.M. in light of the violent and assaultive behaviors posed a risk of danger to public safety. *See* RCW 71.05.010(1)(a). After Western State discovered that C.M.'s commitment order had elapsed, the hospital initiated new proceedings and called for a crisis responder, who conducted a new evaluation and determined C.M. should be placed in emergency detention. As with N.G., commencing new proceedings for C.M. ensured against inappropriate and indefinite commitment, provided speedy evaluation and proper treatment, as well as continuity of care with staff in the same hospital. *See* RCW 71.05.010(1)(b), (c), (e), (f).

While Western State's actions in C.M.'s case show mismanagement, they do not show a total disregard for the ITA. As noted, the hospital prepared a new commitment petition weeks before the original order expired and properly sent it to the court hearing scheduler. The scheduler also followed the proper procedure, but technology issues

14

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

prevented completion of that procedure.  Indeed, the scheduler was not notified of the

error and thus had no opportunity to timely fix it.  This is not a complete lack of notice or

regard for the ITA, rather, it is evidence of an attempt to comply with the act and a

technology failure.

A.C. has been diagnosed with schizoaffective disorder and sometimes has

paranoia and delusions.  During one such incident, A.C. was evaluated by a designated

crisis responder and detained for treatment.  A.C.'s 14-day commitment expired on

April 21, 2021, but A.C. agreed to a 6-day continuance until April 27, 2021.  On

April 26, 2021, 1 day before A.C.'s hearing on that commitment, A.C. declined to be

medicated, yet nurses still administered medication.  At the April 27 hearing, the parties

agreed that this was an error.  The State sought a 1-day continuance so A.C. could appear

unmedicated, which the court granted.  On April 28, 2021, the commissioner ordered

A.C. to undergo 90 days of additional treatment.

On appeal, A.C. argued that a continuance was improper because the commitment

period had expired and the forced medication totally disregarded the ITA.  *In re Det. of*

*A.C.*, No. 82653-1-I, slip op. at 6-7 (Wash. Ct. App. Jan. 18, 2022) (unpublished),

https://www.courts.wa.gov/opinions/pdf/826531.pdf.  The Court of Appeals disagreed,

noting that RCW 71.05.280, which governs 14-day commitments, does not contain

mandatory release language and that RCW 71.05.236 expressly allows continuances in

commitment proceedings.  *Id*. at 7.  This shows that the legislature contemplated

continuances that extend a 14-day commitment can occur and that dismissal is not

15

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

required. *Id.* The court also concluded that the commissioner in A.C.'s case examined the competing factors in the ITA and properly found that deciding the case on the merits was more important than the policy considerations in the statute, and the safety of A.C. was more important than the strict statutory time requirement of the act. *Id.* at 9.

I agree with the Court of Appeals below and the majority here that in A.C.'s case, the ITA's requirements were not totally disregarded. *See* majority at 17-18. However, I depart from the majority's statement that A.C., unlike C.M. and N.G., was "never held without authority of law." *Id.* at 17. A.C. was brought before a judge on the day the original commitment order expired, April 27, 2021, but A.C. had been improperly medicated, and the court granted a continuance until April 28. This plainly violated the ITA's time requirements. By the majority's own reasoning, A.C. was held without authority under the ITA, and accordingly, A.C. should have been released. But, because the court was involved and the medication violation required only 24 hours to remedy, the majority is satisfied that the ITA was not totally disregarded. *See id*.

Without saying so, the majority appears to create a "de minimis" exception to its rule that holding a person without lawful authority is a total disregard of the ITA and merits dismissal. This undefined standard is unhelpful to court commissioners and trial judges working every day to interpret Washington's civil commitment statutes properly and justly. The majority cannot have it both ways—either authority of law in the form of a valid commitment order is required to hold over individuals under the ITA or it is not.

16

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

Our case law and the ITA itself, however, do not require such a rule. Instead, we should consider whether the action or inaction complained of prevents the fundamental purposes of the ITA when determining whether the act's requirements have been totally disregarded. *See* RCW 71.05.010(2). I would hold that the detention of the individuals here was not a total disregard of the ITA and that dismissal was not the appropriate remedy.[5]

With these considerations in mind, I respectfully concur in part and dissent in part.

---

[5] While dismissal is a remedy to be rarely used, persons held over their commitment periods are not without recourse. Relevant here, detention "for more than the allowable number of days" can result in civil damages. RCW 71.05.510. As the State details, other remedies may be sought such as 42 U.S.C. § 1983 actions, habeas corpus or personal restraint petitions, and professional discipline for providers who fail to abide by the ITA. Joint Suppl. Br., *supra*, at 21-22. Another remedy could be a motion to vacate prior involuntary commitment orders. Courts considering future involuntary commitment petitions may consider prior orders and a person's recent history when making a commitment determination. Thus, seeking to vacate a past involuntary commitment would ensure against relying on those improper commitments in subsequent actions. *See In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012). Unlike dismissal, these remedies better serve the legislative intent to focus on the merits of the petition, an individual's needs and safety, and safety of the public.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100668-3 (consol. w/100690-0)
Madsen, J., concurring/dissenting

_Madsen, J._

_Johnson, J._

_Owens, J._

_Stephens, J._